UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAMUEL CURRIE BRIDGES,

      Petitioner,                           Case No. 1:12-CV-12482

v.                                   HONORABLE THOMAS L. LUDINGTON
                                        UNITED STATES DISTRICT JUDGE

STEVEN RIVARD,

      Respondent,

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE
OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS**

A state jury convicted Petitioner Samuel Currie Bridges of two counts of second-degree murder, one count of felon in possession of a firearm, and one count of possession of a firearm in the commission of a felony. For the second-degree murder convictions, Petitioner was sentenced to 35 to 50 years. For the felon in possession of a firearm conviction, he was sentenced to 2 years, six months to five years, to be served concurrently. And for the possession of a firearm in the commission of a felony, Petitioner received a consecutive sentence of two years.

Confined at the St. Louis Correctional Facility in St. Louis, Michigan, Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He asserts that he was denied a fair trial, the evidence was insufficient to convict him, the prosecutor committed misconduct, the defense counsel gave ineffective assistance, the state courts lacked jurisdiction to try his case because of a defective criminal complaint, and that he was deprived of the right to a fair *voir dire* procedure. For the reasons detailed below, the assertions lack merit. The petition will be denied.

I

A

In the early hours of September 24, 2005, Petitioner shot and killed two people at an after-hours bar known as "The Candy Shop" in Detroit, Michigan.

1

At his trial, Rakeya Hall testified that she was at the Candy Shop at the time of the shooting. She referred to Petitioner at trial by his nickname, "Beano," and said that she had known him for a number of years. Hall indicated that a week prior to the shooting, Petitioner had "gotten into it" with someone and ran out of the bar, obtained an AK-47, and returned to shoot his victim in the arm.

On the night in question, Hall testified, Petitioner was wearing a camouflage outfit. There were 60–70 people in the Candy Shop at the time of the shooting. Hall saw Petitioner run past her, and she became afraid that he was going to do something violent. Hall did not observe Petitioner with a weapon at this point. After Hall began running, other people inside of the club began running in an attempt to escape, during which someone knocked Hall down. Petitioner ran out the same door that Hall had come in. After Hall was knocked down, she heard the shooting. Hall testified that the shooting sounded like a machine gun. Hall could not see who was shooting, but she could see the bullets coming through the walls. The shooter was outside.

Hall testified that Petitioner then entered the bar with an AK-47 in his hands and said, "You think this shit is a fucking game?" Hall was on the floor by the couch when she was shot in the upper right arm; seconds later she was shot in the left foot. When Hall was at the hospital after the shooting, she gave a statement to the police: "All I know, he was playing dice in the basement. Beano had money all over the table talking case shit." Hall testified that Petitioner

had the same AK-47 that he had used during the shooting that had taken place a week earlier at the "Candy Shop."

2

Lynda Polk testified that she was also at the Candy Shop on the night of the shooting. Polk was standing near the couch when a number of people ran past her. Polk heard gunshots. People began running in the opposite direction, Polk testified, because bullets started coming through the door. Polk was shot in the legs five times. Polk testified that the shooter was wearing an army fatigue shirt. Polk identified Petitioner as the shooter, testifying that Petitioner was shooting an AK-47 as he was coming through the door.

After Petitioner fired the shots, he ran. Polk heard no more shots after Petitioner ran out. On the night of the shooting, Polk gave a statement to the police, in which she identified the shooter as being a black male, 5'4" or 5'6", slim, around 130 pounds, wearing an army fatigue shirt and black pants.

During cross-examination, Polk admitted that at the preliminary examination she had said that she had only gotten a glance at the shooter and had stated that the man at the defense table at the preliminary examination "could be him." On redirect examination, Polk again positively identified Petitioner as the shooter.

3

Aissa Hamilton testified that she was at the "Candy Shop" at the time of the shooting. Hamilton was near the doorway by a couch when shooting came from outside the bar. Hamilton was not hit by the first round of shoots. The shooter came inside and started shooting, at which point Hamilton was shot. Hamilton did not get a look at the shooter. Hamilton was shot in the

hip.  After she was shot, several people inside shot back at the shooter.  Although Hamilton did not see the shooter's face, she testified that he had a long gun.

4

John Scott, an Assistant Wayne County Medical Examiner, testified that he performed autopsies on the two victims, Rodney Perry and Katrina Harper.  Perry suffered two wounds to the front of the body with one bullet exiting the body and the other bullet remaining and recovered by Scott.  Scott opined that the cause of Perry's death was multiple gunshot wounds and manner of death was homicide.

Katrina Harper received one gunshot wound to her right arm and there was no exit.  Scott recovered a bullet from Harper.  Scott discovered the bullet one-and-one-half inches to the left of midline in her neck.  The bullet had entered the right arm and gone into the right scapula. The bullet shattered the bone and the socket, destroying the shoulder joint before going into the right clavicle through her thyroid gland and through her vocal chords.  The bullet stopped a little to the left of Harper's Adam's apple.  Because of the force of the injuries to Harper, Scott believed that the bullet was shot from a high velocity weapon rather than a handgun.  Scott testified that the injury would be consistent with one received from an assault rifle.  Scott opined that Harper's cause of death was a gunshot wound to the shoulder, the manner of death was homicide.

5

Kevin Reed, an officer with the Detroit Police Department and a firearms expert, also testified.  Presented with a cartridge case, Reed identified it as a .223 caliber (the equivalent of a 5.56 NATO round) designed to be fired from an AK-47, an assault type weapon.

Reed examined twenty-nine casings collected from the scene of the shooting; all were 5.56, head stamped 098, made by Brenalli, and fired from the same weapon.  Reed testified that

there were also four fired bullets or fragments that were .22 metal jacketed bullets, six right. Reed indicated that all four were fired from the same firearm which could have been an assault rifle, an Armelite AR 180, a G-WIN, or an ARP15, the same as an M-16, which Reed indicated looks similar in appearance to an AK-47.  Reed did not think that these type of bullets could be fired from a handgun.

All of these weapons were caliber compatible with the twenty-nine fired casings.  Reed could say that the casings were fired by the same gun but couldn't say that the bullets came from the same gun as the casings without having the gun to examine.  Reed testified that both the bullets and the casings could have been fired by the same gun because they were caliber compatible.

Reed testified that the two bullets recovered by the medical examiner were .22 caliber, fired from the same gun as the bullet recovered from the house next door and the bullet recovered from the crime scene.  Reed testified that all four bullets were fired from the same firearm.  Reed examined two .45 casings fired from the same weapon and recovered just north of the Candy Shop.  Reed testified that these casings could not have been fired from the same gun that fired the fatal bullets that killed Perry and Harper and that had been recovered by the medical examiner.

As noted, the jury convicted Petitioner of two counts of second-degree murder, one count of felon in possession of a firearm, and one count of possession of a firearm in the commission of a felony.

B

Petitioner's conviction was affirmed on appeal. Petitioner filed a post-conviction motion for relief from judgment, which was also denied. The Michigan appellate courts denied Petitioner leave to appeal that decision.

Petitioner now seeks a writ of habeas corpus on nine enumerated grounds. First, Petitioner asserts that he was denied the right to due process of law and a fair trial due to the trial court's refusal to give a particular jury instruction. Second, the evidence produced at trial was insufficient to establish beyond a reasonable doubt that Petitioner caused the death of Mr. Perry or Ms. Harper. Third, Petitioner was denied his due process of law because of prosecutorial misconduct. Fourth, the prosecution did not produce legally sufficient evidence of Petitioner's guilt beyond a reasonable doubt. Fifth, prosecutorial misconduct again denied Petitioner due process of law. Sixth, defense counsel's failure to request the appointment of an expert on eyewitness identification constituted ineffective assistance of counsel. Seventh, defense counsel was ineffective by not obtaining an expert witness to offer alternative explanations consistent with innocence for the presence of particles on the defendant's jacket. Eighth, the district court lacked judicial power and violated Petitioner's rights because the charging document lacked sufficient information to create probable cause to believe the defendant committed the crimes asserted therein. And ninth, jury selection had a plain error.

II

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which governs this case, permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §
2254(d)(1)–(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).

Mere error by the state court does not justify issuance of the writ; rather, the state court's
application of federal law "must have been objectively unreasonable." *Wiggins v. Smith*, 539
U.S. 510, 520–21(2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes
omitted)). Additionally, this Court must presume the correctness of state court factual
determinations. 28 U.S.C. § 2254(e)(1); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)
("The court gives complete deference to state court findings of historical fact unless they are
clearly erroneous.").

III

A

Petitioner first argues that he was deprived of a fair trial by the trial court's refusal to give
the jury the following instruction:

> It is not enough that the defendant's act made it possible for the death to occur. In
> order to find that the death of [the victim] was caused by the defendant, you must
> find beyond a reasonable doubt that the death was the natural or necessary result
> of the defendant's act.

The usage notes for this particular instruction (criminal jury instruction 2d 16.15 or "CJI2d
16.15") indicate that it applies "where there is an issue as to whether an act of the defendant
caused death, or whether death was caused by some intervening cause."

On habeas review, the question is whether the challenged jury instruction so infected the
trial that the resulting conviction violates due process. *Henderson v. Kibbee*, 431 U.S. 145, 154–
55 (1977). Merely showing that the instruction is undesirable, erroneous, or even "universally
condemned" is insufficient. *Id*. It is likewise not enough that there might be some "slight

possibility" that the jury misapplied the instruction.  *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009).

Here, Petitioner presented same argument to the Michigan Court of Appeals.  Rejecting the claim, the court explained:

> Defendant maintains that the trial court should have read the jury CJI2d 16.15 because the evidence reveals that other persons fired guns inside the club, thus making it possible that bullets fired by someone else killed the two decedents. Some evidence at trial, together with a January 10, 2009 Michigan State Police (MSP) laboratory report reexamining the voluminous firearm-related evidence, did establish that at least two other guns were fired inside the club.  The recent MSP report concludes that the two fired bullets removed from the decedents' bodies "are consistent with being .22 Class jacketed (.222/.223/5.45mm caliber) fired boat-tail bullets," the same caliber previously identified at trial.  The MSP report did not positively link the two bullets removed from the decedents as fired from the same weapon, as did the prior firearm evidence examiner, Detroit Police Department Officer Kevin Reed.  But nothing in the MSP specialist's examination tended to undermine Officer Reed's trial testimony that the .22–caliber class of bullets can possibly be fired from several models of assault rifles, and are not compatible with handguns that could have fired the other caliber of casings and bullets the police found, i.e., .38–caliber and .45–caliber.  And the medical examiner testified at trial that with respect to the extensive damage he observed in one decedent's body, "it would be more likely to be a high velocity weapon than a handgun."  Two witnesses wounded in the shooting described at trial that they saw defendant holding an "AK–47," or a "long" gun, but no witnesses saw any other individual inside the club shooting with an assault weapon.
>
> In summary, no evidence suggested that there could have been more than one cause of the decedents' deaths.  The trial court instructed the jury that to convict defendant it must find beyond a reasonable doubt that he "was the person who committed [the crimes]."  Because the record contains no evidence suggesting more than one cause of the decedents' deaths, we find that the trial court's instruction sufficiently protected defendant's rights.  The trial court did not abuse its discretion in finding CJI2d 16.15 inapplicable under the circumstances of this case.

This reasoning is sound.  First, as noted by the court of appeals, the trial judge instructed the jury that to convict Petitioner of the murders, they must find beyond a reasonable doubt that he was the person who committed the crimes.  Defense counsel argued to the jury that there was insufficient evidence to identify Petitioner as the shooter.  Because Petitioner's defense that he

did not cause the victims' death was presented through his defense counsel's argument and was buttressed by the trial court's instruction that the jury must find that Petitioner committed the murders, declining to give the jury the CJI2d 16.15 instruction did not deprive Petitioner of a fair trial. *See Cook v. Foltz*, 814 F. 2d 1109, 1113 (6th Cir. 1987).

Moreover, the evidence did not suggest that there was more than one cause of the victims' death. Several witnesses testified that Petitioner was armed with an assault rifle or a long gun. No witnesses testified that they saw anyone else in the club with an assault rifle or a long gun. Officer Reed testified that the .22 caliber bullets recovered from the victims could only be fired from an assault rifle, not a handgun. The medical examiner testified that the extensive damage to Ms. Harper indicated that the bullet was fired from a high velocity weapon like an assault rifle and not a handgun. In sum, there was no evidence to support Petitioner's argument that he did not cause the victims' death. Declining to give the jury the CJI2d 16.15 instruction did not deprive Petitioner of a fair trial. He is not entitled to habeas relief on his first claim.

B

Petitioner's second and fourth claims argue that there was insufficient evidence to convict him of the murders.

In evaluating the sufficiency of the evidence, the question is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry, however, does not require the court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." *Id*. at 318–19 (citation omitted) (emphasis in original) (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)). *Jackson* thus articulates a highly deferential standard of review for a federal habeas court reviewing a state court conviction. As the Supreme Court recently observed, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S.Ct. 2060, 2065 (2012).

1

Here, Petitioner first contends that there was insufficient evidence presented to establish that his identity as the shooter that caused the victims' death, so as to sustain his convictions for second-degree murder. The Michigan Court of Appeals rejected this claim, explaining:

> Defendant here disputes that the evidence sufficiently proved his identity as the person who caused the two victims' deaths. Club patron and shooting victim Rakeya Hall testified that on the early morning of the shooting she saw defendant playing dice in the club's basement, later noticed him running out of the club, and shortly thereafter heard and saw rapid-fire shooting commence from outside, causing bullets to enter the club through its walls and door. Another shooting victim, Lynda Polk, testified that she watched defendant enter the club's door while firing an assault rifle. Hall recounted that after the shooting from outside had ceased, she observed defendant standing near the club's entrance holding an assault rifle, and that she heard him announce, "You think this shit is a fucking game?"
>
> No witness actually saw defendant fire the assault rifle precisely when any of the victims endured their gunshot wounds. However, given the agreement of several witnesses that gunshots entered the club from outside, shortly after Hall had observed defendant running outside, circumstantial evidence supported a reasonable inference that defendant was the person who fired the assault rifle into the club from outside; and Polk's testimony supplied direct evidence that defendant had fired into the club. Although some evidence proved the presence of other gunfire inside the club, the record contains no evidence that an individual other than defendant possessed an assault rifle. And as we have addressed, the evidence established that the .22–caliber class of bullets that killed the decedents can possibly be fired from several models of assault rifles, and are not compatible with handguns that might have fired the other caliber of casings and bullets the police found. Viewed in the light most favorable to the prosecution, ample

> evidence supported the jury's finding beyond a reasonable doubt that defendant
> caused the decedents' deaths.

Again, this reasoning is sound.  There is more than  sufficient evidence to sustain his conviction

for their murders.

Rakeya Hall testified that a week prior to the shooting, Petitioner had shot a person in the

arm with an AK-47 at the Candy Shop.  On the night of the shooting, Hall testified that Petitioner

ran past her and out the door.  Hall soon after heard shooting which sounded like it came from a

machine gun.  Hall could not see the shooting but could see the bullets coming through the walls.

Immediately after the shooting, Petitioner entered the bar with an AK-47 or similar type assault

rifle in his hand.  This rifle looked similar to the assault rifle used by Petitioner during the prior

shooting at the Candy Shop.  Petitioner was angry and stated, "You think this shit is a fucking

game?"

Lynda Polk testified that Petitioner was shooting an AK-47 as he came through the door.

Polk testified that after Petitioner fired his weapon, he ran away.  Polk further testified that after

Petitioner ran away, she heard no further shots.

Aissa Hamilton testified that after hearing some shots from outside the club, she

witnessed the shooter come inside and begin shooting with a long gun.  Hamilton indicated that

at this point, several persons inside the club shot back at Petitioner.  However, there was no

evidence that any of these persons were armed with an assault rifle, as Petitioner was.

The evidence at trial established that the .22 caliber class of bullets that killed the victims

could possibly be fired from several models of assault rifles, but were not compatible with

handguns that might have fired the other caliber of casings and bullets the police recovered from

the scene.

Lastly, the medical examiner indicated that the injuries to Ms. Harper indicated that the shot came from a high velocity weapon rather than a handgun.

This evidence clears "the threshold of bare rationality." *Coleman*, 132 S.Ct. at 2065. Petitioner's claim must be rejected.

2

As part of his fourth claim, Petitioner argues that there was insufficient evidence of premeditation and deliberation to permit the first-degree murder counts that Petitioner was originally charged with to be submitted to the jury. Petitioner, however, was acquitted of these charges and found guilty of the lesser-included offenses of second-degree murder.

Even if Petitioner is correct that there was insufficient evidence of premeditation and deliberation (an issue that the Court declines to reach), the submission of a criminal charge to a jury constitutes harmless error where the habeas petitioner is acquitted of that charge. *Daniels v. Burke*, 83 F. 3d 760, 765 n.4 (6th Cir. 1996).

Likewise, "clearly established Supreme Court law provides that a defendant has a right not to be *convicted* except upon proof of every element of a crime beyond a reasonable doubt; the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Long v. Stovall*, 450 F. Supp. 2d 746, 752 (E.D. Mich. 2006) (emphasis original) (quoting *Skrzycki v. Lafler*, 347 F. Supp. 2d 448, 453 (E.D. Mich. 2004)). As noted, only violations of clearly established constitutional rights are entitled to habeas relief.

Petitioner's second and fourth claims lack merit.

C

Petitioner's third and fifth claims allege that he was deprived of a fair trial because of prosecutorial misconduct.

Claims of prosecutorial misconduct require a habeas petitioner to show that the prosecutor's so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643–45 (1974); *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir.1999) ("Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation."). The focus is "the fairness of the trial, not the culpability of the prosecutor." *Pritchett v. Pitcher*, 117 F. 3d 959, 964 (6th Cir.1997) (quoting *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

Finally, "state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing in prosecutorial misconduct cases is necessarily imprecise." *Slagle v. Bagley*, 457 F. 3d 501, 516 (6th Cir. 2006) (brackets and quotation marks omitted) (quoting *Donnelly*, 416 U.S. at 645). A habeas petitioner must therefore show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012).

1

Petitioner first claims that the prosecutor committed misconduct when he interrupted defense counsel's cross-examination of Aissa Hamilton and accused him of "throwing . . . whatever you want out there." The judge then cautioned the prosecutor that he was "a little out

of order."   The judge then allowed defense counsel to continue his line of cross-examination. Petitioner also points to comments by the prosecutor that sought to prevent defense counsel from commenting that additional charges had been dismissed in the course of trial.  The prosecutor objected: "[W]hat is going on here? Are we going to follow the rules?"  The trial court overruled the objection and allowed defense counsel to continue his argument.

Even if inappropriate, these comments were not so incendiary as to inflame the jury's passion or render the entire trial fundamentally unfair.

2

Petitioner next contends that the prosecutor committed misconduct by improperly labeling tapes of recorded jailhouse telephone conversations with titles that the prosecutor made up. In rejecting this claim, the Michigan Court of Appeals ruled that Petitioner failed to explain how he was prejudiced from the labeling of the tapes, and moreover, the prosecutor agreed to relabel the tapes by number.

In this Court, Petitioner offers no argument as to how the prosecutor's mislabeling of the tapes was improper or how he was prejudiced by the prosecutor's actions.   Conclusory allegations of prosecutorial misconduct fail to state a claim upon which habeas relief can be granted. *Johnson v. Renico*, 314 F. Supp. 2d 700, 710 (E.D. Mich. 2004).

3

Petitioner next claims that the prosecutor improperly attacked Petitioner's character by arguing that Petitioner's remarks on several recorded telephone calls showed that Petitioner was "the kind of person that would commit this horrific act."

As the Michigan Court of Appeals cogently observed, however, the prosecutor's comment was made in the context of arguing that Petitioner acted with premeditation with

respect to the murders.  Because such remarks were relevant to the issue of premeditation, the prosecutor did not commit misconduct.

4

Petitioner next claims that the prosecutor improperly commented on his failure to take the witness stand, in violation of the Supreme Court's holding of *Griffin v. California*, 380 U.S. 609 (1965).  Petitioner is correct that *Griffin* instructs that the prosecutor may not invite the jury to infer guilt from the defendant's decision not to testify.  Petitioner is not correct, that the prosecutor did so in Petitioner's case.

As a threshold matter, although a prosecutor may not comment on the defendant's declining to testify or produce evidence, the prosecutor may summarize the evidence and comment upon "its quantitative and qualitative significance." *United States v. Bond*, 22 F. 3d 662, 669 (6th Cir. 1994).  Thus, in *Lockett v. Ohio*, 438 U.S. 586  (1978), the Supreme Court held that the prosecutor's repeated remarks that the State's evidence had been "unrefuted" and "uncontradicted" did not constitute an impermissible comment on the defendant's failure to testify.  *Id*. at 595.  The Court explained:

> Lockett's own counsel had clearly focused the jury's attention on her silence, first, by outlining her contemplated defense in his opening statement and, second, by stating to the court and jury near the close of the case, that Lockett would be the "next witness."  When viewed against this background, it seems clear that the prosecutor's closing remarks added nothing to the impression that had already been created by Lockett's refusal to testify after the jury had been promised a defense by her lawyer and told that Lockett would take the stand.

*Id.*;

Here, defense counsel indicated in his opening argument that Petitioner intended "to get on the stand and tell you everything because . . . he wants you to know what really happened that night."  By promising the jury in his opening statement that Petitioner would testify, the defense

counsel focused the jury's attention on Petitioner's later silence.  The prosecutor's remarks were permissible pursuant to *Lockett*.

5

Petitioner next contends that the prosecutor committed misconduct in which he made reference to Petitioner's recorded telephone calls, then remarked, "Why is he — if he's not involved in this case, if he's not the shooter, why is he keeping these people from coming to court? Is it possible because they gave a statement to the police?"

Evidence that a defendant threatened a witness is generally admissible because it is probative of the consciousness of guilt.  *United States v. Fortson*, 194 F. 3d 730, 737 (6th Cir. 1999).  Threats to a witness are also relevant to assess the credibility of that witness.  *Dorchy v. Jones,* 320 F. Supp. 2d 564, 578 (E.D. Mich. 2004) (citing *United States v. Pierson*, 121 F. 3d 560, 563 (9th Cir. 1997)).

Here, because the prosecutor's comments that Petitioner may have threatened the witnesses were based on a reasonable inference from the evidence, they were not improper.

6

Petitioner next contends that the prosecutor attempted to appeal to the emotions or the sympathies of the jury by commenting that Ms. Hall was fearful for her life.

The trial court, however, instructed the jury that they were not to let sympathy or prejudice influence their decision.  *See Cockream v. Jones*, 382 F. App'x 479, 486 (6th Cir. 2010) ("[T]he trial court's instructions that the jury must base their decision on the evidence, not sympathy or prejudice, weigh against finding that the prosecutor's statements violated [the petitioner's] due process rights.").  Given the trial court's instructions and the strength of the evidence of Petitioner, this Court cannot conclude that his due process rights were violated.

-16-

7

Petitioner next contends that the prosecutor expressed his personal belief in Petitioner's guilt when he stated in his opening argument that Mr. Perry's life was extinguished by Petitioner.

To constitute error, a prosecutor's alleged misconduct in arguing his personal belief in a witness's credibility or in a defendant's guilt must be "flagrant." *United States v. Humphrey*, 287 F. 3d 422, 433 (6th Cir. 2002), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002).  "A prosecutorial comment is deemed flagrant if it tends to mislead the jury or prejudice the defendant; if it is one of a series of inappropriate comments; if it was deliberately placed before the jury; and if the other evidence of guilt is weak." *Id.*  Of course, the comments must also be viewed in context. *United States v. Sherrill*, 388 F. 3d 535, 538 (6th Cir. 2004).

Here, the prosecutor's statement to the jurors that Petitioner extinguished the life of the victim was not improper, much less flagrantly so.  It was made as part of a lengthy opening statement that summarized the evidence that he intended to present against Petitioner at trial.  In short, it could be understood as a personal opinion as to Petitioner's guilt only if viewed in isolation and not in the context in which the remark was made.  The prosecutor's remark did not intimate a personal opinion as to Petitioner's guilt and did not constitute misconduct.

8

Petitioner's final argument regarding prosecutorial misconduct is that the prosecutor shifted the burden of proof in his rebuttal argument.  Again, however, given the trial court's instructions and the strength of the evidence of Petitioner, this Court cannot conclude that his due process rights were violated.

The trial court instructed the jury that Petitioner was presumed innocent and that the prosecutor had the burden of proving Petitioner's guilt beyond a reasonable doubt and that Petitioner was not required to prove his innocence. Any prejudice that might have resulted from the comment was cured by the trial court's instructions regarding the proper burden of proof.

Petitioner is not entitled to habeas relief on his third and fifth claims.

D

Petitioner's sixth and seventh claims assert that he was deprived of the effective assistance of trial counsel.

Ineffectiveness of counsel claims have two prongs: performance and prejudice. First, the petitioner must demonstrate that considering all of the circumstances counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, the petitioner must show that the deficient performance prejudiced his defense. *Id*. That is, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "

On habeas review, moreover, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard 'was incorrect but whether that determination was unreasonable —a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quotation marks omitted) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). The Supreme Court explains:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is

whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quotation marks and citations omitted).

Here, Petitioner contends that his trial counsel was ineffective for not calling expert witnesses on eyewitness identification and gunshot particles.

As an initial matter, Petitioner has presented no evidence either to the state courts or to this Court that he has an expert witness who would be willing to testify with respect to either issue. A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell*, 455 F. 3d 662, 672 (6th Cir. 2006). Because Petitioner does not offer any evidence that an expert witness would have testified or what the content of this witness' testimony would have been, Petitioner is unable to establish prejudice.

1

Regarding Petitioner's expert on eyewitness testimony claim in particular, "no precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment." *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011); *Dorch v. Smith*, 105 F. App'x 650, 653 (6th Cir. 2004).

Moreover, although counsel did not call an expert witness on the problems of eyewitness identification, trial counsel discredited Polk. Specifically, counsel elicited testimony that Polk claimed to have chosen two people in a photo showup, when there was no evidence corroborating that a showup ever took place. Petitioner was not denied effective assistance of counsel. Petitioner does not establish constitutionally deficient performance.

2

Nor has Petitioner shown that he was prejudiced by the lack of an expert witness on gunshot particle residue.  As the Michigan Court of Appeals noted in rejecting this claim, Petitioner never admitted that he owned or had worn the jacket that the gunshot residue was recovered from.

Moreover, defense counsel successfully discredited the significance of the gunshot residue evidence through his cross-examination of the forensic chemist.  He elicited that a gun emits more than a million particles when fired, but that only 10 particles were discovered on Petitioner's jacket.  Counsel further elicited that the residue did not establish that the person wearing the jacket had fired a gun.  And counsel elicited that it was possible that anyone who was standing in a room where a weapon had been discharged to have residue on them and that the chemist could not tell how long the residue had been on the jacket.

As counsel was able to elicit testimony regarding the limitations of gunshot residue evidence from the prosecution's expert on cross-examination, not calling a defense expert on gunshot residue was not ineffective.  *United States v. McGill,* 11 F. 3d 223, 227–28 (1st Cir. 1993).

Petitioner is not entitled to habeas relief on his sixth and seventh claims.

E

Petitioner's eighth claim asserts that the state court lacked jurisdiction to try his case due to a defect in the criminal complaint.

The determination of whether a state court is vested with jurisdiction under state law over a criminal case is a function of the state courts, not the federal courts. *Wills v. Egeler*, 532 F. 2d 1058, 1059 (6th Cir. 1976).  Because Petitioner's claim raises an issue of state law, it is not

cognizable in federal habeas review. *United States ex. rel. Holliday v. Sheriff of Du Page County, Ill.,* 152 F. Supp. 1004, 1013 (N.D. Ill. 2001).

F

Finally, Petitioner contends that he was deprived of the right to effective *voir dire* of the jury panel. The prosecutor did not identify Sergeant William Anderson as one of the witnesses that would be called to testify at trial. This omission, Petitioner asserts, deprived him of the right to intelligently exercise any peremptory challenges or challenges for cause.

Petitioner is correct that the prosecutor did not expressly identify Sergeant William Anderson as one of the witnesses that would be called to testify at trial. Instead, he said that one of his witnesses would be Sergeant Bill Anderson. As Petitioner concedes, Bill is the common name for William. Since the prosecutor disclosed the name of Sergeant Anderson during jury selection, Petitioner is not entitled to habeas relief on this claim.

IV

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1) (a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In

applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.* at 336-37.

Petitioner has not made a substantial showing of the denial of a constitutional right, and thus, a certificate of appealability is not warranted.

Likewise, Petitioner will not be granted leave to proceed in forma pauperis on appeal as any appeal could not be taken in good faith. *See* Fed. R. App. P. 24(a).

V

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus (ECF No. 1) is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that leave to proceed in forma pauperis on appeal is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 23, 2013

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney of record herein by electronic means and upon Samuel Bridges #343258, at Oaks Correctional Facility, 1500 Caberfae Highway, Manistee, MI 49660  first class U.S. mail on July 23, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS